AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Delaware

| United States of America | ) |
|---|---|
| v. | ) |
|  | ) Case No. |
|  | ) 19- 110 M |
|  | ) |
| NIKOLAOS VASARDIS | ) |
|  | ) |
| *Defendant(s)* |  |

SEALED UNSEALED 4/11/19 KJK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __March 11, 2019__ in the county of __Sussex__ in the _____ District of __Delaware__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 33 U.S.C. § 1907(a) | Failure to Maintain an Accurate Oil Record Book in Violation of the Act to Prevent Pollution from Ships |
| 18 U.S.C. § 2 | Aiding and Abetting |

This criminal complaint is based on these facts:
See Affidavit Attached.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Brent McKnight, Special Agent, CGIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 04/11/2019

_____
*Judge's signature*

City and state:  Wilmington, Delaware     Hon. Sherry R. Fallon, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Brent McKnight, being duly sworn, depose, and state that I am a Special Agent with the United States Coast Guard Investigative Service (CGIS). I make this affidavit in support of a criminal complaint charging Nikolaos Vasardis, Chief Engineer of the Motor Tanker (M/T) EVRIDIKI, with a violation of 33 C.F.R. § 151.25(h), 33 U.S.C. § 1907(a), and 18 U.S.C. § 2.

## I. INTRODUCTION

1. I am a Federal Agent, authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute arrest and search warrants issued under the authority of the United States.

2. I have been a Special Agent ("SA") with the CGIS for approximately 14 years and I am currently assigned to CGIS Resident Agent Office, Philadelphia, Pennsylvania as the Resident Agent in Charge (RAC). I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program and numerous other training programs related to criminal investigations. As a CGIS SA, I have participated in numerous criminal investigations of individuals who are in violation of laws and statutes of the United States and the United States Code of Federal Regulations have conducted multiple investigations associated with Marine Pollution (MARPOL) violations. Prior to becoming a SA with CGIS, I was a SA with the United States Secret Service (USSS) for approximately 7 years. During my tenure with the USSS I conducted numerous criminal investigations involving various violations of laws and statutes of the United States and the United States Code of Federal Regulations.

3. The information set forth in this Affidavit is known to me as a result of an investigation led by USCG Marine Safety Division personnel. Thus, the statements contained in this Affidavit

1

are based in part on information provided by other USCG personnel, as well as my own observations and my experience as a CGIS SA.

4. This Affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached criminal Complaint. Thus, I have not set forth each and every fact learned during the course of the investigation.

## II. LEGAL FRAME WORK

5. The United States is part of an international regime that regulates discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (the "MARPOL Protocol"). The MARPOL Protocol was enacted into United States law by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq*. The regulations promulgated under APPS apply in part to all commercial vessels over 150 gross tons that carry oil in bulk as cargo while operating in United States waters, or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country other than the United States. 33 C.F.R. § 151.09(a)(5).

6. During the course of normal operation, large oil tanker vessels routinely generate oil-contaminated bilge wastewater. This wastewater is generated when water in the bottom of the vessel (known as the bilge) mixes with oil that has leaked and dripped from the machinery and the lubrication and fuel system for the engines. The MARPOL Protocol prohibits the discharge of such oily mixtures except where: (a) the oily mixture is processed through approved oil filtering equipment; and (b) the oil content of the effluent ultimately discharged into the sea does not exceed 15 parts per million (ppm). In practice, prior to discharge, oily mixtures are processed through a pollution control device known as an Oily Water Separator

(OWS) which separates water from oil. Processing is monitored by a device connected to the OWS known as an Oil Content Meter (OCM). This device senses the amount of oil remaining in effluent after processing by the OWS. If the OCM detects an oil content of greater than 15 ppm in the effluent, it sounds an alarm, shuts down the pumps, and/or diverts flow back to the bilges in order to prevent the discharge into the sea of oil in an amount greater than 15 ppm.

7. The MARPOL Protocol requires that oil discharges be documented in an Oil Record Book. Consistent with the requirements of the MARPOL Protocol, APPS regulations require that an oil tanker of 150 gross tons and above maintain an Oil Record Book Part I (ORB). Entries must be make in the ORB whenever certain machinery space operations occur, including when there is a discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces. 33 C.F.R. § 151.25(d)(4). Each discharge must be fully recorded without delay in the ORB, so that all entries in the book are appropriate to the operation completed. Each completed operation shall be signed by the person or persons in charge of the operation, and each completed page signed by the Master or other person having charge of the ship. 33 C.F.R. § 151.25(h). The Master or other person having charge of a ship required to keep an ORB shall be responsible for the maintenance of such a record. 33 C.F.R. § 151.25(h). Persons, such as the Chief Engineer, can be held liable as a principal for aiding and abetting the knowing failure to accurately maintain an ORB. 18 U.S.C. § 2.

8. It is unlawful to act in violation of the MARPOL Protocol, APPS, or implementing regulations. 33 U.S.C. § 1907(a). Any person who knowingly violates the MARPOL Protocol, APPS or implementing regulations commits a Class D felony. 33 U.S.C. § 1908(a).

9. The USCG, an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 522(a) to board vessels and conduct inspections and investigations of potential violations of international and United States law, including the MARPOL Protocol and APPS. In conducting inspections, commonly known as Port State Control ("PSC") examinations, USCG personnel rely on the statements of the vessel's crew and documents, including information contained in the ORB. The USCG is specifically authorized to examine the vessel's ORB to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate operating procedures; whether it poses any danger to United States' ports and waters; and whether the vessel has discharged any oil or oily mixture in violation of the MARPOL Protocol, APPS, or any applicable federal regulations. 33 C.F.R. § 151.23(a)(3) and (c).

### III. SUMMARY OF INVESTIGATION

10. The M/T EVRIDIKI was an 84,796 gross-ton, ocean-going oil tankship, with International Maritime Organization (IMO) Number 9318137, registered under the flag of Liberia. The registered owner of the vessel was Evridiki Navigation, Inc., a Liberian company with a registered office in Monrovia, Liberia. The vessel's operator was Liquimar Tankers Management Services, Inc., a Liberian company with a registered office in Monrovia, Liberia, and an operating address at 1-3 Alopekis Street, 106 75 Athens, Greece. The M/T EVRIKIKI's classification society was Det Norske Veritas.

11. On or about February 20, 2019, the M/T EVRIDIKI set sail from Agbami Terminal in Liberia. On or about March 10, 2019, the M/T EVRIDIKI arrived at Big Stone Anchorage, which is located in Delaware Bay. Big Stone Anchorage is within the jurisdiction of the

United States and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the District of Delaware.

12. At all times material, Nicholas Vastardis, a citizen of Greece, was the Chief Engineer of M/T EVRIDIKI. As the Chief Engineer, Vastardis was in charge of all engine room operations, reported directly to the Captain, and supervised all engine room crew members. He was also the person on the ship who maintained and made entries in the ORB.

13. On or about March 11, 2019, USCG Inspectors boarded the M/T EVRIDIKI while it was moored in Big Stone Anchorage, to conduct a scheduled Priority II PSC examination, a USCG Certificate of Compliance renewal examination, and to determine the ship's compliance with APPS.

14. As part of its overall examination, USCG inspectors examined the OWS. At the beginning of this examination, the USCG asked Mr. Vastardis to operate the vessel's OWS, which was located in the ship's engine room.

    a. When Vastardis first activated the OWS, the USCG inspectors observed that the OCM registered an oil content of zero ppm. At the same time, however, USCG inspectors observed a pipe connecting the OWS to the OCM. This pipe, which was opened and closed by a lever marked "sampling," provided the OCM with bilge water that had been processed by the OWS, for purposes of measuring oil content. When Mr. Vastardis ran the test, the USCG inspectors observed that this sampling lever was in the closed position. When the OWS is running with the sampling lever closed, the OCM is not able to sample the bilge water being discharged to determine the amount of oil in the effluent. Based upon their training and experience, USCG inspectors

believed that the OCM was reading zero because the sample line was closed and OWS-processed bilge water was not running through the OCM for testing.

    b. USCG inspectors then requested that Mr. Vastardis again run the OWS, this time with the sample lever in an open position. Immediately upon doing so, the OCM alarmed, and registered an oil content in excess of 30 ppm. This process was repeated multiple times with the same result. As noted above, when OCM alarms, it shuts down the pumps, and/or diverts flow back to the bilges in order to prevent the discharge into the sea of oil in an amount greater than 15 ppm.

    c. While the system was being tested, Mr. Vastardis told the USCG inspectors that he always ran the OWS with the sample lever in the open position.

15. During its examination, USCG inspectors instructed the ship's crew to open up the OWS in order to inspect its internal components. Upon examination, inspectors found that all internal components of the OWS were heavily coated in black oil and soot. Based on my experience as a Special Agent with the Coast Guard, this indicates to me that this oil substantially impeded the OWS's ability to filter out oil and properly process oily material from the vessel's bilge waste system.

16. As part of its examination, USCG inspectors also examined the historical recorded data within the OCM. This data showed the dates on which the OWS was run, together with the level of oil identified by the OCM during each operation. This examination showed that between February 8, 2018, and March 8, 2019, the ship's OWS was run on 16 separate occasions, for a total of 55.5 hours of operation, and the discharge of approximately 84,563 gallons of oily bilge water. During eight operations, the OCM displayed an oil content of

zero ppm. For the other eight operations, the OCM continuously displayed an oil content of 1-2 ppm.

17. On March 13, 2019, USCG inspectors again spoke with Mr. Vastardis. At that time, he indicated that he had been onboard the ship for six months. During this discussion he provided conflicting responses as to the position of the sampling lever during normal OWS operation, indicating that it was fully open, open only a little bit, and less than 45 degrees open.

18. The USCG also examined the vessel's ORB and looked for entries indicating that the OWS had been operated. The ORB entries indicated the OWS was operated on January 23, 2019, February 16, 2019, February 26, 2019 and March 8, 2019 for a total of 1,140 minutes through 15 ppm equipment. These entries in the ORB were signed by Mr. Vastardis. The bottom of each completed page was signed by the ship's master.

19. Based on my experience as a Special Agent, these facts indicate to me that:

   a. The OWS on board the M/T EVRIDIKI was likely not capable of separating out oil to meet the 15 ppm requirement. Knowing this, Mr. Vastardis defeated the overall OWS system by closing the sample line, tricking the OCM sensor into registering an oil content of less than 15 ppm, when in reality the level of oil discharged was substantially greater than this legal limit.

   b. To conceal this violation, Mr. Vastardis made false entries in the ship's ORB, asserting that the bilge water was processed through "15 ppm" equipment, when in fact the OCM was being defeated; thus the "15 ppm" equipment referenced in the ORB was deceptive and inaccurate.

20. Based on the foregoing information, there is probable cause to believe that on or about March 11, 2019, Mr. Vastardis, as chief engineer of the vessel, failed to maintain an accurate ORB, and aided and abetted the knowing failure to maintain an accurate ORB, all in violation of 33 C.F.R. § 151.25(h), 33 U.S.C. § 1907(a), and 18 U.S.C. § 2.

## IV. CONCLUSION

21. Based on the foregoing information, there is probable cause to believe that on or about March 11, 2019, Mr. Vastardis knowingly failed to maintain an accurate ORB, and aided and abetted in the knowing failure to maintain an accurate ORB, all in violation of 33 C.F.R. § 151.25(h), 33 U.S.C. § 1907(a), and 18 U.S.C. § 2.

*Brent McKnight*
Brent McKnight
Special Agent, U.S. Coast Guard Investigative Service

Sworn to before me and subscribed in my presence this 11th day of April, 2019.

United States Magistrate Judge
Sherry R. Fallon