```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF DELAWARE

UNITED STATES OF AMERICA  )
                          )
                          )
   v.                     )   Criminal No.: 19-CR-66-01-RGA
                          )
NIKOLAOS VASTARDIS,       )   Hon. Richard G. Andrews, U.S.D.J.
                          )
                          )
         Defendant.       )
```

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM AND
OPPOSITION TO MOTION FOR VARIANT SENTENCE**

NOW COMES the above-named Defendant, Nikolaos Vastardis, through his attorney, Bruce M. Merrill, and responds to the government's Sentencing Memorandum and Opposition to his Motion for Variant Sentence (D.I. 166).

The government filed a single Memorandum and Opposition that addresses both Chief Vastardis' Memorandum of Law in Aid of Sentencing (D.I. 153) and his corresponding Motion for Variant Sentence (D.I. 154).[1]

The gist of the government's Sentencing Memorandum is that it agrees with every enhancement that Probation has suggested is applicable in this case. This is not surprising since Probation adopted the government's ambitious advocacy as to the salient facts of this case for its Offense Conduct section in the draft

---

[1] Chief Vastardis notes that the spelling of his first name is Nikolaos, not Nicolas.

1

PSR. No challenge or objection to those facts by Chief Vastardis was resolved by Probation in the final PSR, but merely noted as an objection. *See* PSR, ¶¶14,21,28,30(fn. 6),34(fn. 7),41(fn. 11), 43(fn.12),44-48. This includes a matter as elementary as how many contracts Chief Vastardis had with Liquimar on the M/T Evridiki. In its submission to Probation, the government said it was ten ("[Chief Vastardis] had worked aboard the M/T Evridiki on 10 separate occasions, each contract lasting approximately six months." *See* Govt. Factual Background, §4.b.1; Chief Vastardis advised Probation that he had had only four contracts on the M/T Evridiki. *See* Defendant's Objections to PSR, dated March 6, 2020. Probation nevertheless stated 10 contracts in the PSR, but noted Defendant's objection (¶14). In its sentencing memorandum, however, the government acknowledges that Chief Vastardis has only had four contracts on the M/T Evridiki. Gb at 1.[2]

This Reply will addresses only the most significant of the government's arguments, in order to demonstrate their

---

[2] Incredibly, and disingenuously, the government also suggests that it is Chief Vastardis' fault that the M/T Evridiki and its crew members were detained in this matter for several months(Gb at 21), yet earlier in its memorandum it concedes that the Coast Guard made the decision to detain the ship and its crew <u>before it had even spoken with Chief Vastardis</u>, based solely on its review of the ORBs ("the ORB was a focus of the Coast Guard's examination <u>even before the physical inspection of the engine room, and was</u>

insubstantiality to this Court, and will rely upon Chief Vastardis' original Memorandum in Aid of Sentencing, Motion for Variant Sentence, and what may be added orally at sentencing, to refute the rest.

1. The Proper Holding of *Abrogar*

The government attempts to hold Chief Vastardis accountable for alleged improper discharges through an erroneous reading of the Third Circuit's decision in *United States v. Abrogar*, 459 F.3d 430 (3d Cir. 2006).[3] Gb at 15-18.  But, this position bespeaks what is fundamentally a small group of DOJ ECS lawyers deciding that they are self-appointed worldwide enforcers of what are, in essence, alleged violations of foreign laws occurring outside the United States, involving non-citizens.[4]

---

the basis for the vessel's detention . . ." (Gb at 12)(emphasis added).

[3] Chief Vastardis notes that the government cites to unpublished cases in support of this section of its memorandum, giving only ECF cites for the cases to which it refers.  While it customary to provide the Court with copies of unpublished cases when same are referred to, the more important point is that these references have no precedential value. The Third Circuit Court of Appeals own internal operating procedures provide that unpublished, non-precedential opinions are not binding on panels in later cases pending before the Third Circuit. *See Chehazeh v. Attorney Gen.*, 666 F.3d 118, 127 n.12 (3d Cir. 2012) (citing Internal Operating Procedures 5.7 (3d Cir. 2010)).  Accordingly, unpublished district court orders from other districts are certainly not binding and without any analysis or copies provided to this Court lack even persuasive value.  *See Pinho v. Gonzales*, 432 F.3d 193, 213, 2005 U.S. App. LEXIS 28086, *54 fn. 26 (3d Cir. 2005) ("We remind the District Court that unpublished district court opinions are not a source of law.").

[4] Incredibly, having failed to adduce any evidence of improper discharges at trial, the government now attempts to quantify those alleged

3

*Abrogar* involved the 6-point enhancement under USSG §2Q1.3, and the language for the 6-point enhancement applies if "the offense <u>resulted in</u> an ongoing, continuous, or repetitive discharge . . . of a pollutant . . ." (emphasis added). The 4-point enhancement, on the other hand, applies "if the offense <u>otherwise involved</u> a discharge, release, or emission of a pollutant . . ." (emphasis added). The *Abrogar* Court's discussion of why the offense of conviction did not "result in" continuous discharges makes clear, however, that the offense of conviction also did not "involve" discharges, for it expressly held that discharges are <u>not</u> "relevant conduct" and do not apply to Guideline §2Q1.3, which includes both the 6- and 4-point enhancements. 459 F.3d at 437. It specifically rejected the government's argument that "[u]nder the Sentencing Guidelines, th[e] [improper] discharges are relevant conduct for purposes of determining the total offense level." *Id*. at 436.

The *Abrogar* Court made clear that high seas discharges are <u>not</u> substantive offenses under U.S. law and are not "relevant conduct" with respect to the offense of conviction, *i.e.*, the failure to maintain an accurate ORB while in the navigable waters of the United States, "under the plain meaning of USSG,

---

improper discharges at "over 62,000 gallons of oil bilge waste." Gb at 4.

§1B1.3." *Id*. at 436-37.  Stated somewhat differently, while every violation of the APPS may violate the provisions of MARPOL, not every violation of MARPOL violates the APPS. *Id*. at 434 ("Congress did not make every violation of MARPOL by every person a crime under U.S. law.").

Moreover, *Abrogar*'s discussion of the "resulted in" requirement applies equally to the question of whether the offense "otherwise involved" discharges.  Since the discharges are <u>not</u> relevant conduct, the offense did <u>not</u> "otherwise involve" discharges.  *Abrogar* addressed the "resulted in" language as follows:

> The Government summarizes its textual argument by asserting that because the improper discharges 'are relevant conduct, they are considered part of the 'offense' as that term is used by the Guidelines, and therefore the 'offense' of conviction resulted in the continuous discharge of oily bilge waste and oily sludges into the ocean.'  We conclude that the converse of the Government's position is true: because the improper discharges are not relevant conduct, they cannot be considered part of the 'offense' under the Guidelines, and therefore the 'offense' did not result[] in' repeated discharges as is required before the six-level enhancement under §2Q1.3 may be applied.

*Id*. at 436.

The 4-level enhancement does not expressly include the verb phrase "resulted in," however, it does include the phrase "the offense otherwise involved."  And, that language fits equally

5

well: "because the improper discharges are not relevant conduct, they cannot be [otherwise involved in] the offense." *Id*.

Moreover, the core rationale of *Abrogar* is that Congress chose <u>not</u> to punish high sea events:

> [E]ven if we were to accept the Government's policy argument as to §2Q1.3 considered in isolation, any policy concerns implicit in §2Q1.3(b)(5) must yield to the plain meaning  of the other Guidelines and statutory provisions at issue in this case. As discussed above, the Government's assertions that the improper discharges constitute 'relevant conduct' fails under the plain meaning of §1B1.3. In addition to the general rule that the plain text trumps implicit policy concerns as a matter of statutory construction, we must consider the fact that §1B1.3 applies to all of the individual substantive provisions of the Guidelines and reflects the broader will of Congress as to a fundamental aspect of sentencing policy -- the scope and type of collateral conduct to be included in sentencing. Furthermore, any policy concern implied by the Guidelines must be subordinated to the scope of liability and applicability explicitly set forth by Congress as part of the substantive statute at issue.  Here, 33 U.S.C. §1908(a) is plainly limited by §1902 and the regulations accompanying the APPS.  The Government's policy argument is thus unavailing.

*Id*. at 436-37.

Significantly, the above-quoted paragraph refers to Guideline §2Q1.3, which includes both the 6- and 4-point enhancements. So, *Abrogar* effectively holds that neither enhancement can be applied. *Abrogar*'s summary of its holding confirms this point:

6

> In sum, we conclude that Abrogar's 'offense of conviction' -- taking into account the text of the relevant provisions, of the APPS and accompanying regulations -- was the 'failure to maintain an accurate oil record book while in the U.S. waters or in a U.S. port.' Under that definition, of the 'offense of conviction,' the improper discharges are not 'relevant conduct,' they cannot be considered part of the 'offense' under the Guidelines, and therefore the 'offense' did not 'result[] in' repeated discharges of a pollutant. As such, the District Court erred in applying the six-level sentencing enhancement.

*Id.* at 437.

Since the alleged discharges are not "relevant conduct" and "cannot be considered part of the 'offense' under the Guidelines, then the offense did not "otherwise involve[]" discharges, just as it did not "result[] in" them.

   2. License, Visa and Employment Consequences

The government of Greece and the government of Liberia, as the vessel's Flag State, are the countries with jurisdiction to punish events occurring on board the M/T Evridiki by a Greek national on the high seas. Under MARPOL and the APPS, if the United Sates is unhappy with the extent of their enforcement efforts, its remedy is to arbitrate against those foreign countries (in particular the Flag State) before the International Maritime Organization. It is not the preogative of the United States to assume that the foreign countries with jurisdiction will fail to exercise it and, therefore, to simply

7

treat an alleged violation of their laws as relevant conduct that should be bootstrapped into a U.S., port-state, record keeping prosecution.

That is the fundamental message of *Abrogar* and of MARPOL and the APPS' jurisdictional provisions. *See e.g. Abrogar*, 459 F.3d at 436, fn. 3 ("The APPS provisions and regulations cited above do not merely implicate jurisdiction. They are worded in such a way as to define, for purposes of U.S. law, the scope within which MARPOL violations constitute crimes at all, irrespective of implications for jurisdiction proper."). The government, essentially, prosecuted a record keeping violation, and under the treaties and laws of this country, and Third Circuit precedent, it is expected and required to defer to the foreign powers with respect to how Chief Vastardis should be punished for violating the laws of those countries. Sadly, DOJ ECS lawyers have lost sight of the important limit on their power to punish foreigners for events occurring outside of the United States. *Abrogar* reminds us that the Third Circuit and Congress both respect those limits, and the ECS lawyers should be obligated to respect those limits, as well. *Id*. at 435 (Government's argument in favor of broad reading of the APPS to include, for "offense defining" purposes, conduct not only

8

within U.S. water but for whole of Chief Engineer's tenure on the vessel, would be so broad as to contravene the meaning of those provisions).

    3. <u>Unwarranted Sentencing Disparities under §3553(a)</u>

To avoid unwarranted disparities in sentences imposed on persons "who have been found guilty of similar conduct," one must identify prosecutions for similar conduct. §3553(a)(6).

The government provided as Exhibit 1 to its Sentencing Memorandum a table detailing "certain" cases for various prosecutions involving a period of confinement since 2003. These are clearly the harshest cases that the government could find, as there are no cases included for which no period of incarceration was imposed, which is why there are no cases included from the District of Delaware in this table.  In fact, the only Third Circuit cases included are from the District of New Jersey and range from one month of home detention to eight months incarceration.  As every sentencing is fact driven, there is no way to compare these cases to Chief Vastardis' situation without knowing the details of each case.  *See Gall v. United States*, 552 U.S. 38,__, 128 S.Ct. 586, 598(2007)(A court should "consider every defendant as an individual and every case as a unique study in human failings that sometimes mitigate,

9

sometimes magnify, the crime and the punishment to ensue.").

Chief Vastardis has attached, as Exhibit A, a similar table showing sentences for Chief Engineers from around the country from 2008 until 2016 who have been convicted of MARPOL-related offenses. With the same caveat mentioned above, the majority of cases in this representative sample resulted in a sentence of probation. In fact, Chief Vastardis submits that the vast majority of these types of cases result in a probationary sentence with no fine.

   4. The COVID-19 Pandemic

The government specially declined to address any issues related to the COVID-19 Pandemic, suggesting that it is a "developing situation." Gb at fn. 1. The current Pandemic is hardly a "developing situation." It is a major crisis, not only in the United States, but around the world! Every State in the U.S. is now operating under a declared State of Emergency with either voluntary or mandatory "stay at home" restrictions. On a daily basis we are told of the thousands of people who have died, both in the United States and around the world, from contracting the Coronavirus. Businesses and courts are closed.

Of special significance to the criminal justice system is the impact that COVID-19 is having on incarcerated populations

in the United States.  Most recently (April 2, 2020), an article from the New England Journal of Medicine explains that "[h]ighly transmissible novel respiratory pathogens pose a new challenge for incarcerated populations because of the ease with which they spread in congregate settings." <u>Flattening the Curve for Incarcerated Populations - COVID-19 in Jails and Prisons</u>, www.nejm.org/doi/full/10.1056/NEJMp20056587(Attached hereto as Ex. B).  The authors, who are medical doctors, note that "jails and prisons should prepare to deal with a high burden of disease" and to "prepare now, by 'decarcerating,' or releasing, as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm; <u>urging police and courts to immediately suspend arresting and sentencing people, as much as possible, for low-level crimes and misdemeanors</u> . . ." *Id*. at 3 of 6(emphasis added).

The percentage of individuals infected in the general population versus the BOP populations is staggering.  *See* Graph comparing infection between inmate to national population since march 20, 2020, attached as Ex. C taken from https://federaldefendersny.org/

11

   Chief Vastardis is a 51 year old male smoker, who has been under a great deal of stress, due to both his current situation and the fact that he is not with his family during this time of world-wide crisis.  Stress is a risk factor for the coronavirus.  Chief Vastardis has been detained in this country since March 2019, a period of over 13 months.  The world is dealing with its worst health crisis since the Spanish Flu Pandemic of 1918.  Chief Vastardis wants to be at home, in Greece, with his wife and children, not holed up in an extended stay motel in Newark, DE. As noted in his Motion for Variant Sentence, Chief Vastardis has been detained in what, for him, is a foreign country, away from family and friends, where his native language is not spoken, and surrounded by a culture and customs that are entirely alien to him.  Now, he is forced to deal with the COVID-19 crisis, alone and away from his family. This is weighing very heavily upon him, as both a husband and a father.

   With particular relevance to the instant sentencing, the crimes of which Chief Vastardis has been convicted are non-violent offenses which do not warrant a potential death sentence.  And that is precisely what any sentence of incarceration can entail for a prisoner at this point in time. Judges around the country are currently entertaining, and

granting, Motions for Compassionate Release to the most vulnerable inmates in our jails and prison populations. *See e.g.* General Order 20-16, In Re: Coronavirus Public Emergency, from the District of Massachusetts, April 13, 2020, attached hereto as Exhibit D.

Respectfully, that is precisely why the government chose not to address this crisis in its Sentencing Memorandum: because it knows that it cannot defend or justify its unbridled fervor for seeking incarcerative sentences in these types of cases against the backdrop of the current crisis in this country caused by this pandemic. Yet, the truth is, as noted above, that the majority of these types of cases result in unsupervised probation and no fine to the individual.

The instant COVID-19 pandemic is just one more reason why a non-incarcerative sentence is justified in the instant case.

## CONCLUSION

**WHEREFORE,** for the reasons set forth herein, as well as in Defendant's Memorandum in Aid of Sentencing and corresponding Motion for Variant Sentence, this Court should not accept the enhancements made by Probation to the Base Offense Level of 14 in the PSR. Moreover, it should grant Defendant's Motion for a Variant Sentence and impose a sentence of probation, coupled

13

with an immediate deportation to Greece, as the appropriate sentence in this matter.

Dated at Portland, Maine, this 13th of April, 2020.

/s/Bruce M. Merrill
Bruce M. Merrill, P.A.
225 Commercial Street/Ste. 501
Portland, ME 04101
(207)775-3333 (Tel.)
E-mail: mainelaw@maine.rr.com
Attorney for the Defendant,
Nikolaos Vastardis

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th of April, 2020, I electronically filed the above *Defendant's Response to Government's Sentencing Memorandum and Opposition to Motion for a Variant Sentence* on behalf of the above-named Defendant, with the Clerk of Court, using the CM/ECF system, which will send notification of such filings to all other counsel of record.

/s/ Bruce M. Merrill
Bruce M. Merrill, P.A.
225 Commercial St./Suite 501
Portland, ME 04101
207/775-3333 (Tel.)
207/775-2166 (FAX)
E-Mail: mainelaw@maine.rr.com

14