IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Crim. No. 19-66-RGA |
| | ) | |
| NIKOLAOS VASTARDIS, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

I have a host of disputes about the Sentencing Guidelines calculations.  I told the parties I would resolve them prior to sentencing.  (D.I. 164).  I now do so.

The relevant documents are the amended PSR (D.I. 147), Defendant's sentencing memo (D.I. 153) , the motion for a downward departure, which is not about the guidelines calculation (D.I. 154), the Government's sentencing memo (D.I. 166), and the reply sentencing memo (D.I. 167), which only replies on one of the five issues—the discharge of a pollutant enhancement.

The essence of the offenses is that Defendant Vastardis made entries in the Oil Record Book indicating that bilge waste discharges were less than 15 ppm oil as they were being made through properly functioning equipment including an Oil Content Monitor, whereas in reality the bilge waste discharges were not being run through that piece of equipment.  Then, during the Coast Guard inspection in the Delaware Bay in March 2019, the Oil Record Book with the false entries was provided to the Coast Guard, and Vastardis said that he had used the equipment properly.

The PSR calculation of the offense level, using the 2018 Sentencing Guidelines Manual,

starts with the calculation of two "groups."

First,

Count 1 – Failure to maintain an accurate oil record book

+6 base offense, § 2Q1.3(a)

+4 discharge of a pollutant, § 2Q1.3(b)(1)(B)          --- Objected to by Def.  #1

+2 role in the offense—manager or supervisor, § 3B1.1(b)  --- Objected to by Def.  #2

+2 role in the offense—private trust, § 3B1.3        --- Objected to by Def.  #3

+2 obstruction of justice, § 3C1.1          --- Objection Abandoned[1]

= 16 Total

Second,

Counts 2, 3, 4 -- Falsification of Records, Obstruction of Justice, False Statements[2]

+14 base offense, § 2J1.2(a)

+2 a substantial number of records, § 2J1.2(b)(3)(A)    --- Objected to by Def. #4

+2 role in the offense—manager or supervisor, § 3B1.1(b)  --- Objected to by Def. #2

+2 role in the offense—private trust § 3B1.3        --- Objected to by Def. #3

+0 obstruction – does not apply § 2J1.2, Application Note 2

= 20 Total

The probation officer decided, and the parties agree (D.I. 166 at 10), whichever group

results in the greater score controls, so the overall total as calculated in the PSR is 20.  The

guideline range that corresponds to a final offense level of 20 and a criminal history category of I

---

[1] While this is raised in the PSR (*see* D.I. 147 at 34), it is not raised in Defendant's sentencing memo, and, indeed, since Defendant's conclusion is that his offense level for Count I should be 8 (*see* D.I. 153 at 8), it is apparent that he has abandoned this objection.

[2] Count 4, which charged a violation of 18 U.S.C. §1001, is combined with the two counts charging violations of 18 U.S.C. §§ 1505 & 1519 pursuant to the USSG cross-reference at § 2B1.1(c)(3) since the conduct charged in Count 4 is also charged in Count 3.  (If the cross-reference did not apply, the offense guideline for Count 4 would be §2B1.1(a)(2), which is a 6).

is 33-41 months imprisonment.  Vastardis argues the final offense level should be 14, and that

the corresponding guideline range should be 15-21 months imprisonment.  (D.I. 154 at 2 n.1).

I address Defendant's objections, as recited in the PSR and amplified in his sentencing

memo.

Objection #1 is that the discharges are not relevant conduct to the offense.  Defendant

states no evidence of a discharge of a pollutant was introduced at trial (D.I. 153 at 2), but the

guidelines do not depend on what was introduced at trial.  Defendant cites *United States v.*

*Abrogar*, 459 F.3d 430, 435 (3d Cir. 2006).  Indeed, I think *Abrogar* is determinative.  It holds

that for a foreign-flagged vessel, the "offense of conviction" is "failure to maintain an accurate

oil record book while in the navigable waters of the United States."  *Id*. (italics omitted).  The

Court further held that in view of that understanding of the offense of conviction, "the

Government's assertion that 'under the Sentencing Guidelines, the improper discharges are

relevant conduct for purposes of determining the total offense level' is incorrect."  *Id*. at 435-36

(cleaned up).  The Court of Appeals could not have been any clearer.  Improper (as contrary to

the MARPOL convention) polluting discharges on the high seas by a foreign-flagged vessel that

precede a failure to maintain an accurate oil record book offense are not "relevant conduct" and

thus are not included with the offense of conviction when calculating the Sentencing Guidelines.

It makes no difference to the relevant conduct determination that the Government now argues for

the four-point enhancement of §2Q1.3(b)(1)(B) rather than the six-point enhancement of §

2Q1.3(b)(1)(A) that *Abrogar* addressed, as what is not relevant conduct to the offense of

conviction is not relevant conduct to the offense of conviction no matter which section of the §

2Q1.3 guideline enhancement is under consideration.

Section 2Q1.3(b)(1)(B) states, "[I]f the offense otherwise involved a discharge, release, or emission of a pollutant, increase by 4 levels." In *Abrogar*, subsection (1)(A) clearly would have failed unless the relevant conduct was included, as its enhancement depended on "the offense result[ing] in" discharges. In the failure to maintain oil record book offenses, the discharges always occur before the offense of conviction, so it makes no logical sense to say that the failure to maintain the oil record book on the date when the vessel showed up in U.S. waters resulted in discharges that had occurred earlier. The "otherwise involved" language of subsection (1)(B) does not so obviously fail when limited to the offense of conviction. Indeed, there is some sense to saying that an offense that involves record-keeping entries about discharges and requires proof that discharges occurred falls within the literal scope of subsection (1)(B). If the guideline read, "If the offense involved a false entry about the discharge of a pollutant, increase by 4 levels," it would be clear, I think, that resort to relevant conduct would be unnecessary. On the other hand, the way I read *Abrogar*, the key is that the discharges occurred on the high seas and were not crimes under U.S. law. If the discharges in *Abrogar* had occurred while the vessel was in U.S. waters, that would have been a different matter. I think the same analysis applies here. That is, if there were discharges occurring in U.S. waters, they would be included as relevant conduct to the offense of conviction. But discharges occurring on the high seas are not part of the offense of conviction, cannot be relevant conduct, and consequently cannot be used to enhance the offense level calculation. This is so even though evidence of the discharges in international waters could be used at trial to prove the entries in the oil record book were false.

The Government cites three district court decisions that have upheld the four-point

enhancement after *Abrogar* (D.I. 166 at 17);[3] I have no choice but to follow the Court of

Appeals.[4]

Objection #2 is that there is only one criminally responsible individual here.  (D.I. 153 at

4-5).  The Government's response, which concentrates on the obstruction offenses, is that

Defendant was the second-in-command of the vessel and that he was responsible for the

operation and maintenance of the OWS.  (D.I. 166 at 13).  The Government states that the

---

[3]  I tracked these three cases down (made more difficult because the Government did not provide
them and the case numbers, docket items, and relevant transcript pages were not wholly
accurate).  I note that defendants received sentences of probation in two of them, and one
month's imprisonment in the third.  The Government also submitted a Table captioned "Certain
Cases Involving a Period of Confinement Since 2003."  (D.I. 166-1).  By my count, it lists
seventy-five defendants.  I do not know what percentage this represents of relevant defendants
sentenced between 2003 and May 2018, the date of the most recent case on the list.  The
Government implies that the defendants in the seventy-five cases were "involved in similar
conduct."  (D.I. 166 at 26).  The Government also says (not in connection with the Table) that
there have been "hundreds of similar prosecutions."  (*Id*. at 28).  Of the seventy-five in the
Government's Table, I count six (Samson (12 months), Gonzalez (21), Taohim (12 and a day),
Duffiney (50), Pegram (12), Oh (12)) who received sentences of twelve months or more of
imprisonment and also eight who received fourteen days or less of imprisonment (Julian (1 day),
Koutoukakis (1), Angelou (10), Chrysovergis (10), Dancu (5), Duque (1), Tumakov (7), McKay
(1)).  I started to look at the nineteen whose sentences were said to be entirely home detention
(Mun (1 month), Sassin (5), Prokakis (2), Monsen (6), Pena (6), Papadakis (1), Stamatakis (1),
Kang (3), Lee (3), Cavadas (6), Rodrigues (3), Yang (2), Silva (4), Bachtel (24), Martinez-
Zambrana (6), Nielsen (4), Sullesta (14), Kallikis (6), Arcolas (1)).  I was curious about how
courts were sentencing foreign nationals, who I presumed did not have U.S. homes in which to
be detained, to home detention.  But the first two I looked at (Mun and Prokakis) were not
actually home detention sentences—they were some form of community confinement, so I
thought the Table was probably not sufficiently accurate for me to spend time trying to use it in
connection with "home detention" sentences.   My overall takeaway from the Table and the
Government's other statements is twofold: (1) the Government's proposed guideline range of 33-
41 months is far outside the norm for the sentences actually given for cases like the one before
me; and (2) to the extent there is a norm, it is that the defendant is sentenced to probation.
[4] The Government also cites a guideline calculation in a different, expedited PSR (D.I. 166 at
17), which I adopted without objection by defense counsel.  That defendant was sentenced to
probation, so any incorrect guideline application there had no negative impact on the defendant.
I am not bound by my previous decisions adopting agreed-upon findings or legal conclusions,
and I give that particular decision no weight.

evidence shows that there was (1) another chief engineer who did the same thing as Vastardis but at different times when Vastardis was not aboard the vessel, (2) a "second engineer" who helped Vastardis run the OWS and who lied when interviewed by the Coast Guard, and (3) "shore-side employees of Liquimar who provided the false OCM certificates and [provided inadequate resources] to manage the bilge waste." (*Id*. at 13-14).  There is, however, no basis to believe that Vastardis managed the other chief engineer—they were equals; there is no evidence that Vastardis managed the second engineer in connection with what that engineer told the Coast Guard; and there is no evidence that Vastardis managed the shore-side employees.  The fact that Vastardis was a manager/supervisor/leader of the engineering department is irrelevant to the actions of people he did not manage/supervise/lead, and it does not make him the manager/supervisor/leader of the second engineer in connection with the obstruction offenses. Thus, there is no basis for the enhancement for the role in the offense.[5]  I also note that pursuant to *Abrogar*'s logic, the role in the offense adjustment for the APPS offense seems even less likely, because managing the engineering department while the oil waste was being sent overboard is not relevant conduct.

Objection #3 is that making the entries did not require a position of private trust.  Section 3B1.3 states, "If the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  A position of "public or private trust" is one that is "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G., § 3B1.3, App. Note 1.  Defendant argues that the private trust

---

[5] I note that the District Court in the *Prokakis* case reached this conclusion in regard to the APPS offense.  *United States v. Prokakis*, No. 13cr00040, D.I. 152 at 21 (E.D. Va. Dec. 18, 2013).

enhancement does not apply because making entries in a log book did not involve a position of

trust and because there is no victim. (D.I. 153 at 6, 7 n.3). The Government responds, in

relevant part, that the Coast Guard and the Master rely on the Chief Engineer. (D.I. 166 at 14).

Perhaps the Coast Guard relies upon the Chief Engineer, and probably it is usually difficult for

the Coast Guard to determine whether an Oil Record Book entry is false, although the hundreds

of similar prosecutions suggest that the Government might be overstating the case.

It is not entirely clear to me whether this enhancement applies in relation to the APPS

offense. I have considered the en banc decision by the Court of Appeals in *United States v.*

*Douglas*, 885 F.3d 124 (3d Cir. 2018).[6]  In order to answer the question of whether Vastardis

held a position of trust, I "will ask whether the defendant had the power to make decisions

substantially free from supervision based on (1) a fiduciary or fiduciary-like relationship, or (2)

an authoritative status that would lead his actions or judgment to be presumptively accepted."

*Id*. at 133.   While I doubt that the fiduciary prong applies, the decisions of the Chief Engineer

would lead his crew – the engineering department – to accept his actions and judgments.

Perhaps with the APPS count, it makes sense to answer in the affirmative "the second part of the

inquiry [-- asking] whether the position significantly facilitated the commission or concealment

of the crime." *Id*. at 134.  It appears that the Master simply signed off on Vastardis's entries in

the log book. But in regard to the obstruction counts, I do not think the abuse of a position of

trust enhancement applies.  The thrust of the obstruction counts is that Vastardis presented false

---

[6] *Douglas* overruled a number of Third Circuit panel decisions.  It does not mention *United States v. Babaria*, 775 F.3d 593, 596-97 (3d Cir. 2014), which held that a physician/medical director "occupied a position of trust vis-à-vis Medicare and Medicaid."  The Court came to that conclusion applying the analysis overruled in *Douglas. If Babaria* is still good law, it would tend to support the Government's position in regard to the applicability of the abuse of a position of trust enhancement.

documents and testimony during the Coast Guard investigation.  He committed the crimes to cover up his own actions.  Being Chief Engineer did not give him any special ability or position to deceive the Coast Guard.  Thus, while I will apply the enhancement on the APPS count, I do not apply it to the obstruction counts.

Objection #4 relates to an infrequently litigated guideline section, §2J1.2(b)(3).  *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016) ("dearth of caselaw" relating to § 2J1.2(b)(3)(C)).  The guideline section states, "If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by 2 levels."

Defendant argues that the entries were made in a single record and therefore did not involve a substantial number of records.  The PSR recommends application of the enhancement under subsection (3)(A), but also mentions the Government's argument that subsection (3)(B) applies.  (D.I. 147 at ¶ 88 & n.23).  The Government's argument in its memo is that all three subsections apply, but that the most appropriate is subsection (3)(B) because the Oil Record Book is an "especially probative record," which is examined "in every MARPOL inspection and every Certificate of Compliance inspection."  (D.I. 166 at 11-12).  The Government does not address the verbs in subsection (3)(B).  No one destroyed the Oil Record Book, and no one altered it.[7]  Thus, subsection (3)(B) does not apply.

---

[7] After I had reached this conclusion, I noticed while looking into another issue that at least one other District Court had reached the same conclusion.  *See United States v. Prokakis*, No. 13cr00040, D.I. 152 at 29 (E.D. Va. Dec. 18, 2013).

Nor do I think subsection (3)(A) applies.  That subsection requires either "destruction, alteration, or fabrication."  The Government says entries in the Oil Record Book were "falsified."  (*Id*. at 11).  Other entries were "literally true" but "created the false and misleading impression of proper testing, [etc.]."  I do not think the guidelines meant for "fabrication" to sweep so broadly that it includes genuine documents that have false entries.  First, "fabrication" has to be read in conjunction with the two other nouns in subsection (3)(A).  "Fabrication" makes sense as a noun used to describe records that have been created for the occasion, as opposed to records that include false entries made before the time of the Coast Guard inspection.  That's how the other two nouns are used.  Destruction and alteration (in context) refer to actions taken to existing records. All three nouns refer to some action taken to change the status quo.  Second, obstruction of justice involving documents is almost always going to involve some combination of false, altered, or withheld documents.  The enhancement is for especially bad behavior; it should therefore not be read so broadly as to apply in nearly all cases.  Thus, I do not think subsection (3)(A) applies.

That leaves the third catchall subsection.  I cannot conclude that the offense was "otherwise extensive in scope, planning, or preparation."   Extensive in scope is not the same as extensive in duration.  And I am not sure, following the logic of *Abrogar*, that the duration is any longer than the time the vessel was actually in the Delaware Bay.   The Government includes a number of other activities in order to argue for extensiveness.  The Government asserts that other log books and notes did not reference the Oily Waste Separator problems; there was a "lack of documentation" regarding the need to offload waste on shore; the safety committee meeting log

9

had a "false and misleading entry" relating to an incident with BP in March 2018;[8] and the vessel

inspection discovered two fraudulent Oil Content Monitor calibration certificates during the

Coast Guard inspection.[9]  These additional activities, to the extent they are actually relevant

conduct to obstruction offenses, fail to make out the necessary showing of "extensiveness"

Thus, I do not give the §2J1.2(b)(3) enhancement.

Thus, my recalculated guidelines are as follows:

First,

Count 1 – Failure to maintain an accurate oil record book

+6 base offense, § 2Q1.3(a)

+2 role in the offense—private trust, § 3B1.3

+2 obstruction of justice. §3C1.1

= 10 Total

Second,

Counts 2, 3, 4 -- Falsification of Records, Obstruction of Justice, False Statements

+14 base offense, § 2J1.2(a)

= 14 Total

IT IS SO ORDERED this 20th day of April 2020.

/s/ Richard G. Andrews_____
United States District Court

---

[8] The Government concedes that the BP incident (which took place at a port in Greece) is not relevant conduct.  (D.I. 166 at 6).

[9] The presentence report does not say who presented the Oil Content Monitor calibration certificates to the Coast Guard, but the implication is that it was not Vastardis. (D.I. 147 at ¶¶ 57-58).  I take it that generally the shoreside personnel of a shipping company are the ones responsible for a ship having the proper paperwork.  Thus, I am not convinced that there is any evidence that Vastardis presented any false calibration certificates to anyone knowing that the certificates were false.  I also do not accept the characterization that he gave "false and evasive" answers about the certificates when questioned by the Coast Guard as sufficient to prove that he actually lied about the certificates.